# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3255

_____

United States of America

*Plaintiff - Appellee*

v.

Saul Rodriguez Pineda

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: February 13, 2026
Filed: June 30, 2026

_____

Before LOKEN, LAVENSKI R. SMITH, and STRAS, Circuit Judges.

_____

LAVENSKI R. SMITH, Circuit Judge.

After conducting a series of controlled buys from Saul Pineda, law enforcement arrested him on narcotics charges. At trial, Pineda testified that he made the drug sales in response to threats to his life and the life of his family and sought a jury instruction on duress. The district court[1] declined to give the instruction because

_____

[1]The Honorable Donovan Frank, United States District Judge for the District of Minnesota.

the threats were not immediate and Pineda had reasonable alternatives to committing the offense. The jury convicted Pineda. He now appeals his conviction, challenging the district court's decision not to provide a duress instruction. We affirm.

## I. *Background*

Beginning in September 2022, law enforcement set up a series of three controlled buys between a confidential informant and Pineda. These buys took place at Pineda's residence in Shakopee, Minnesota. Each transaction involved only Pineda and the informant. During the first buy, on September 14, 2022, the informant purchased a pound of methamphetamine for $5,600. Pineda showed off his new Hummer parked in the driveway to the informant. The second and third buys occurred on September 23, 2022, and October 4, 2022, respectively, and both involved the informant purchasing a pound of methamphetamine for $2,800.

Following the controlled buys, law enforcement obtained a search warrant for the residence and the vehicles present. During the search, law enforcement located multiple digital scales, drug ledgers, packaging materials, and cocaine. Additionally, they found a liquid methamphetamine conversion lab in a shed on the property. They also found two coolers buried in the yard that contained numerous resealable plastic bags, each containing approximately one pound of methamphetamine. In total, law enforcement gathered approximately 31 pounds of methamphetamine buried in the yard.

The government subsequently indicted Pineda on three counts of distributing methamphetamine and one count of possession with the intent to distribute methamphetamine. Prior to trial, the government learned that Pineda intended to assert coercion or duress as a defense at trial. During trial, Pineda provided an offer of proof as to facts justifying the defense. The district court reserved ruling on the appropriateness of a duress jury instruction until after Pineda testified.

At trial, Pineda testified that before participating in the controlled buys, he was threatened by two armed men. He stated that their armed threat forced him to

participate in the controlled buys. He alleges that before coming to the United States he and his cousin were kidnapped while in Mexico by armed men. These men made contact with Pineda's wife and threatened him. Pineda alleges that the men told him, "[Y]ou have to do whatever I tell you, otherwise your family can be killed or I can kill you right now." R. Doc. 80, at 25. The men then coordinated Pineda's transport from Mexico to Minnesota. Once in Minnesota they allegedly put him up in a house where he was to remain. They commanded him to take care of Rojelio Zendejas and be responsible for the house. Pineda believed that this responsibility included drug dealing as well as taking care of Zendejas. Pineda claimed that he was required to do whatever Zendejas said.

On cross-examination, Pineda admitted that he could have gone to the police but feared the threat against his family in Mexico as well as himself. When asked if he recalled a time that he believed he could escape without danger to his family, he said, "Yes . . . [t]hat came to mind to flee but at the same time I knew that my whole family was going to lose their life, so I just took it—took the anger and the helplessness of not being able to do anything." *Id.* at 42.

Additionally, Pineda testified that Zendejas and his son told him to take the blame for the drugs located at the house. Pineda told them that he would. However, during an interview with law enforcement, Pineda denied selling the methamphetamine. Pineda also admitted that Zendejas and his son had just returned to the United States the day before his arrest. Prior to that, Pineda spent 15 to 20 days alone at the residence.

After the evidentiary portion of trial, the district court addressed whether to instruct the jury on a duress defense. Taking Pineda's testimony as true and declining to make credibility determinations, the district court denied the motion to give the instruction. It found that "based on the lack of specificity and imminency, the length of time that the drug sales went on and the lack of any specific instructions to law enforcement at an early age . . . that [there was] a lack of evidentiary foundation as to" duress. *Id.* at 74. The court noted the absence of immediate threat and availability

of a legal alternative to breaking the law. The district court recognized that Pineda may have had fears, "but that's not sufficient if there's a lack of a present, immediate, and impending specific threat either to him or his family that's well-grounded." *Id.* at 75. The district court reasoned:

> And so the [district c]ourt first, with respect to [the immediacy of the threat], and then really on a secondary matter with respect given the length that the sales went on and the coming and going of individuals to Mexico that—and especially in light of some, you know, remarks and the availability of the sister in California, the option of if not talking to law enforcement, reasonable legal alternative of either—which is the third element of—with or without talking to confidentially to law enforcement, trying to leave without destroying any of the evidence in the case, so the [district c]ourt feels that as a matter of law the [district c]ourt cannot conclude there was a serious, immediate threat of harm either to himself or his family.

*Id.* Based on this finding, the district court declined to instruct the jury on duress. The jury found Pineda guilty.

## II. *Discussion*

"We generally review a district court's refusal to provide a requested instruction for abuse of discretion, but we review *de novo* whether a defendant produced enough evidence to warrant an instruction on an affirmative defense." *United States v. Sharron*, 986 F.3d 810, 813 (8th Cir. 2021) (quoting *United States v. Davis*, 237 F.3d 942, 945 (8th Cir. 2001)). "A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Diaz*, 736 F.3d 1143, 1149–50 (8th Cir. 2013) (quoting *United States v. Shinn*, 681 F.3d 924, 929 (8th Cir. 2012)). To succeed using a duress defense, a defendant must prove by a preponderance of the evidence that

> (1) he was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of

-4-

death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to commit a criminal act; (3) that he had no reasonable, legal alternative to violating the law; and (4) that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm.

*Id.* at 1150 (quoting *United States v. Gamboa*, 439 F.3d 796, 816 (8th Cir. 2006)). This "requires more than a 'generalized and speculative fear' of violence." *United States v. Myles*, 962 F.3d 384, 388 (8th Cir. 2020) (quoting *United States v. Morales*, 684 F.3d 749, 756 (8th Cir. 2012)).

Pineda argues that he had no choice but to follow the instructions of Zendejas, that he could not go to law enforcement, and that he could not flee due to threats to his family and his own life. Pineda argues that the threats were specific because the threateners told him that they called his wife and she would not be harmed if he complied. Pineda emphasized his fear that flight or calling law enforcement were not viable alternatives. He claimed to still have that fear.

The government replies that the threats did not rise to a level warranting a duress instruction. Specifically, the threats were not immediate nor related to the conduct charged. Pineda had ample opportunity to report the information to law enforcement. Pineda testified that he was threatened sometime before July 14, 2022. The controlled buys, however, did not occur until September and October. No evidence connected the early July threats with the controlled buys in the fall. Thus, the general threat, or the initial threat to follow directions is too remote from the charged offenses to constitute duress under *Myles*. As to contacting law enforcement, Pineda could have reported to law enforcement during the two-to-three weeks prior to his arrest when he was left alone and not monitored by Zendejas or his son.

Our cases typically decline to require the duress instruction where the threats involved different coercive directions and the threats were not connected to the defendant's alleged criminal conduct. In *Morales*, we declined to recognize a duress defense because the threats were related to a prior separate occasion and not the controlled buys relevant in that case. 684 F.3d at 756 (distinguishing *United States v. Ceballos*, 593 F. Supp. 2d 1054, 1061–62 (S.D. Iowa 2009), which allowed the duress defense where the court found an ongoing threat based on evidence that defendant was repeatedly beaten and choked when she refused her domestic partner's demands). Additionally, in *Morales*, we held that the defendant could have gone to law enforcement. *Id.* at 757. Similarly, in *United States v. Harper*, 466 F.3d 634 (8th Cir. 2006), we declined to recognize the duress defense due to the absence of an immediate threat. The threat against the defendant in *Harper* occurred "on a prior, separate occasion" from the later acts and "at most" led the defendant to fear "that in the future [the individual] might act on the prior threat." *Id.* at 648.

Here, Pineda claimed that his kidnappers threatened harm to him to coerce his compliance with Zendejas's general instructions. But the evidence does not connect this alleged duress to completing the specific controlled buys that he performed, or even to engaging in the illegal sale of methamphetamine generally. Pineda only testified that he was required to do what Zendejas told him. He also had to document everything that occurred in the home in a daily log and send it to a contact in Mexico. However, he did not allege that he was instructed to sell to the informant or anyone else. Indeed, Zendejas and his son were not even present in the country during any of the buys. Also, showing off an expensive automobile during a drug sale does not comport with acting under the coercion contemplated by the duress defense. These facts resemble *Morales*, where the previous threat or coercion was too remote to justify the defense of duress. Similarly, that the kidnappers allegedly talked to Pineda's wife months before the controlled buys does not justify an immediate threat.

Additionally, Pineda's autonomy during the Zendejas' absence supports the conclusion that he likely could have safely called law enforcement rather than break

the law. Other than fear from the general threat to do what the kidnappers said, Pineda offered no other justification. He had nearly three unobserved weeks to safely report the threats.

### III. *Conclusion*

For these reasons, the district court did not err by declining to instruct the jury on duress. Affirmed.

_____